## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| M SCIENCE LLC and M SCIENCE HONG KONG LIMITED, | ) Case No. _____ |
| | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) **JURY TRIAL DEMANDED** |
| v. | ) |
| | ) |
| STEPHEN A. LUBAN and YIPIT, LLC d/b/a YIPITDATA, | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

## <u>COMPLAINT</u>

Plaintiffs M Science LLC ("M Science") and M Science Hong Kong Limited ("M Science HK") (together, "Plaintiffs"), by their undersigned counsel, file this Complaint against Defendants Stephen A. Luban ("Luban") and Yipit LLC, d/b/a YipitData ("Yipit") (together, "Defendants"), and aver as follows:

### PARTIES

1.      M Science is a limited liability company organized under the laws of the State of Delaware and is authorized to do business in the State of New York.  M Science maintains its principal place of business at 45 W. 25th Street, 9th Floor, New York, NY 10010-2035.

2.      M Science HK is a limited liability company incorporated and registered in Hong Kong.  M Science HK is a wholly owned subsidiary of M Science.

3.      Luban is an adult individual who, upon information and belief, currently resides in the State of California.  Upon information and belief, for a period from approximately 2012 until February of 2023, Luban maintained a residence in New York City.

4.      Yipit, upon information and belief, is a limited liability company organized under the laws of the State of Delaware and is authorized to do business in the State of New York.  Yipit

maintains its principal place of business at 90 5th Ave, 11th Floor, New York, New York 1001-2051.

5.    Yipit is data-driven research and analytics firm that directly competes with M Science and M Science HK.

6.    Since approximately March of 2020, Yipit has employed Luban as its Vice President of Product Development.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this civil action under 28 U.S.C. § 1331 because the case arises, in part, under the federal Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*

8.    This Court has supplemental jurisdiction over the state law claims in this action under 28 U.S.C. § 1367 because such claims are so closely related to the Defend Trade Secrets Act claim that they are part of the same case and controversy.

9.    This Court has personal jurisdiction over Luban because he has the required minimum contacts with this forum.  Luban maintained a residence in New York City from approximately 2012 until February of 2023.  During the relevant time period, Luban worked for Yipit, which is headquartered in New York, interacted with Yipit's New York headquarters, performed services for Yipit in New York, accessed, developed or enhanced data maintained by Yipit in New York, availed himself of the benefit of being employed by a New York company, and helped generate profits for a New York company.  Luban accessed Plaintiffs' protected computer systems and databases, without authorization, while he was located in New York. Further, upon information and belief, Luban used Plaintiffs' trade secret research reports and data in New York and disclosed such information to recipients in New York, including other employees at Yipit which has its headquarters in New York.  Based on Luban's contacts as described herein,

it was reasonably foreseeable that Luban would be haled into court in the United States District Court for the Southern District of New York.

10.     This Court has personal jurisdiction over Yipit because Yipit has the required minimum contacts with this forum.  Yipit transacts business and maintains its principal place of business in New York; holds itself out to potential customers in New York; allowed Luban to perform work for it in New York; and, upon information and belief, misappropriated Plaintiffs' confidential, proprietary information and trade secrets in New York.  Based on Yipit's contacts as described herein, it was reasonably foreseeable that Yipit would be haled into court in the United States District Court for the Southern District of New York.

11.     Venue is appropriate in this judicial district under 28 U.S.C. §1391 because at least one of the Defendants resides in this judicial district and a substantial part of the events and omissions giving rise to the Plaintiffs' claims occurred in this judicial district.

## FACTS

### A.     <u>Plaintiffs' Confidential, Proprietary, and Trade Secret Information</u>

12.     Plaintiffs are data-driven research and analytics firms that provide the same products and services to clients around the world.  Plaintiffs employ teams of industry experts that offer domain expertise and valuable triangulation of multiple data types to provide deep, company-specific analyses and visibility into the competitive dynamics of more than 1,000 public and private companies.  Based on their examination of dozens of data sources, Plaintiffs' analysts provide Plaintiffs' customers with investment research products and services, including company and industry reports, interactive data dashboards, and direct data downloads that contain Plaintiffs' curated research and proprietary analytics.  Plaintiffs' research products are the product of the extensive skill and knowledge of Plaintiffs' experienced workforce who use Plaintiffs' know-how, technology, processes, and other intellectual property to create unique reports and detailed

information relating to the companies and industries under review.  Plaintiffs' research products and services are developed, in substantial part, in New York.

13.  Plaintiffs' research products and their processes and methods for developing those products are the lifeblood of their business.  Competitors cannot access this information using proper means.  In fact, Plaintiffs' research products and the processes and methods for developing those products are what provides Plaintiffs with a competitive advantage over its competitors.  If competitors had access to this information, they could use it to duplicate Plaintiffs' research, utilize it to calibrate their own research, and gain an unfair advantage in competing for business.

14.  For this reason, Plaintiffs undertake substantial efforts to protect their research products and services and their underlying processes and methodologies for developing them.

15.  Plaintiffs have their employees sign employment agreements which include prohibitions on disclosing, using or exploiting for the employees' own benefit or for the benefit of anyone other than Plaintiffs, Plaintiffs' confidential and proprietary information, including their research, processes, and data sources.

16.  Plaintiffs also maintain a Confidentiality and Material Nonpublic Information Policy that all employees must review and attest to.  The policy prohibits employees from using confidential information, including information about Plaintiffs' data sources, data processing methodologies, and models and research information and analyses, for any purpose other than the business purposes of Plaintiffs.

17.  Plaintiffs also employ technical restrictions to prevent the theft of confidential and proprietary data and methodologies.  For example, Plaintiffs maintain a policy requiring that all company-related work be conducted on Plaintiffs' infrastructure.  Moreover, Plaintiffs do not allow personal unmanaged devices to connect to Plaintiffs' network.  Rather, Plaintiffs only allow

company-managed laptops and registered devices to connect to Plaintiffs' computer systems and network via VPN for remote access. While other personal computers may remotely access Plaintiffs' network via a terminal service (i.e., Citrix), the access is restricted; employees are not permitted or able to transfer data from the corporate network to the personal computer or vice versa.

18.    Further, by default, Plaintiffs block their employees' use of web-based email websites like Gmail and online storage platforms like Box.com; restrict the use of USB and other portable data storage devices by disabling USB and portable media capabilities on company computers; and limit the ability of its employees to print remotely, all to prevent the unauthorized transmission, ingress, or egress of Plaintiffs' data and information.

19.    Moreover, while Plaintiffs provide and make available their research products and services to their customers, the customers' access to and use of Plaintiffs' products and services are subject to requirements and restrictions set forth in Research Services Agreements between the customers and M Science and/or M Science HK. Plaintiffs' Research Services Agreements expressly prohibit customers from sharing M Science's proprietary information and intellectual property with any third party except as needed to perform the customer's services and obligations set forth in the agreements.

20.    In addition, all research reports Plaintiffs deliver to customers contain explicit disclosures stating:

> All material contained herein, or in any report or service accessible hereby (collectively, "Services") is the property of M Science unless otherwise indicated. All trademarks, service marks, logos and trade names used in the Services are proprietary to M Science or other respective owners. The Services are proprietary, confidential and provided for the exclusive use of the recipient. Any unauthorized use of the content of the Services, including the disclosure of confidential information contained within it, is strictly prohibited.

B.    **Plaintiffs' Agreement to Provide Limited and Restricted Access and Use of Their Confidential and Trade Secret Information to a Customer for Which Defendant Luban Worked**

21.    Defendant Luban was employed by a customer of Plaintiffs between approximately April of 2019 and March 2020.

22.    That customer, referred to herein as "Customer 1," was a Hong-Kong-based investment advisory firm.

23.    To facilitate and advance its own business activity, Customer 1 entered into a Research Services Agreement ("Agreement") with M Science in 2016.    The Agreement was subsequently assigned to M Science HK in April of 2020.    Under the terms of the Agreement, M Science agreed to "provide and make available to [Customer 1] the services set forth on the Order Form(s) attached" to the Agreement.    The Agreement also permitted "Users" – "employee[s] of [Customer 1] that [are] given access to [M Science's] Services on behalf of" Customer 1 – to use the reports.

24.    The Agreement further provided, in pertinent part:

> Customer shall be permitted to use the Services for internal purposes only. Customer shall not allow access to or use of the Services by anyone other than its authorized Users. Customer shall not: (a) copy, modify or distribute any publication provided by M Science as part of the Services; (b) rent, sell, lease, or provide access to the Services on a time-share or service bureau basis, or otherwise provide or disseminate to any third party (including any affiliate) any information contained in any publication delivered to Customer in connection with the Services, whether for sale or otherwise; or (c) transfer any of its rights hereunder (except as specified in Section 10(b) below). Customer shall be responsible for the actions and omissions of its Users in connection with the Services.
>
> ***

6

Customer acknowledges that as between M Science and Customer, all intellectual property rights in or relating to the Services are and shall remain the exclusive property of M Science or its licensors, and that other than the limited right to use the Services as provided herein, no other intellectual property right of any kind or nature is being conveyed or granted to Customer in connection with this Agreement.

25.     The Agreement further required Customer 1 to agree "not to (i) disclose or (ii) use … [M Science's] Confidential Information … without prior written consent of [M Science]," except such disclosure to Customer 1's "employees, attorneys, agents, auditors, directors, officers, affiliates and contractors … as required to perform services and obligations set forth in this Agreement." "Confidential Information" is defined to include, among other things, "trade secrets" and "M Science's information, research reports and data sources."

## C.     Luban's Temporary and Limited Access to Plaintiffs' Confidential and Trade Secret Information

26.     Sometime in 2019, Luban, in his capacity as an employee of Customer 1 and pursuant to the terms of the Agreement between Customer 1 and M Science, was designated as a "User" of Plaintiffs' services.

27.     As a User, Luban was authorized to access reports and associated data files published by Plaintiffs and to use those reports and associated data files solely to advance Customer 1's business interests subject to the terms of the Agreement.

28.     In connection with his status as a User and to enable his access to Plaintiffs' services, Luban was given login credentials to Plaintiffs' research portal, through which Plaintiffs provided to Customer 1 Plaintiffs' specialized research reports and associated data files.

29.     Plaintiffs also sent emails, typically daily, directly to Customer 1's and its Users' inboxes.  The emails contained links to the specific research reports and associated data files in

Plaintiffs' portal which Customer 1 had contracted to receive.  As an employee of Customer 1 and a registered User, Luban received these emails and had the ability to use the links to access Plaintiffs' computer systems and databases solely to advance Customer 1's business interests subject to the terms of the Agreement.

D.    **Defendants Gain Unauthorized Access to and Improperly Use Plaintiffs' Confidential and Trade Secret Information**

30.    In or around March 2020, Luban's employment with Customer 1 terminated.

31.    Upon information and belief, Luban's employment with Yipit as Vice President of Product Development commenced shortly after he left Customer 1.

32.    Yipit is a competitor of Plaintiffs and maintains an office in Hong Kong, as well as locations in the United States.  In fact, the companies market and sell their investment research products to many of the same clients and compete for the same investment advisor clients in the United States, Hong Kong and globally.

33.    Plaintiffs maintain an access log that records, among other data points, the login credentials of each User or the specific User email link used to access Plaintiffs' library of reports and associated data files.

34.    Plaintiffs' access log shows that, on nearly 200 occasions between March 2020 and April 2022, Plaintiffs' restricted research portal was accessed using Luban's unique login credentials that were assigned to him when he was an employee of Customer 1 or by clicking on links embedded in emails from Plaintiffs sent to and received by Luban in his capacity as an employee of Customer 1.

35.    Upon information and belief, it was Luban that was accessing Plaintiffs' research portal, notwithstanding the fact that he was no longer either an employee of Plaintiffs' customer or otherwise authorized to access or use Plaintiffs' reports, analyses, or data.  Notably, Plaintiffs'

access logs show the IP address from which the access was made and the corresponding geographic location. The logs show that Plaintiffs' restricted research portal was accessed numerous times using Luban's credentials from Montana, which is where, upon information and belief, Luban was residing during part of the time period in question.

36.    Of note, Plaintiffs' access logs indicate that on nearly 50 occasions, Luban accessed not only the Plaintiffs' written research report, but also an associated Excel "back-up" file containing extensive and detailed curated data across multiple tabs supporting the corresponding research report. The Excel files reveal, among other things, the specific metrics modeled, calculated or tracked by Plaintiffs and include years of historical data that would be invaluable to a competitor wishing to improve or build a model or, even worse, validate or adjust reports and estimates that it was going to sell to investors. The use of wrongfully obtained information to compile 'alternative data' licensed to investors with the knowledge that it will be used to inform investment decisions would raise potential securities law concerns of the type highlighted by the Securities and Exchange Commission in connection with the 'alt data' sector and which are core to clients' due diligence reviews.

37.    The data that Luban accessed is precisely the type of data that someone in a product development role at a competitor could use to gain an unfair advantage over Plaintiffs in developing or enhancing the specialized in-depth research that Plaintiffs' customers are willing to pay substantial sums for.

38.    On each occasion Luban used his login credentials and/or opened hyperlinks to access Plaintiffs' confidential information between March 2020 and April 2022, Luban was the VP of Product Development at Yipit. Luban obviously accessed and misappropriated Plaintiffs'

research, data, analyses, and conclusions for the purpose of using that information to advance the business interests of Yipit.

39.    Each time Luban used his login credentials and/or opened hyperlinks to access Plaintiffs' research, data, analyses, and conclusions, he would have been able to download and/or print the information he accessed.  Upon information and belief, Luban did so and shared Plaintiffs' confidential information and trade secrets with others at Yipit to assist in the development and/or enhancement of research products Yipit used to compete with Plaintiffs.

40.    Among the data that Luban accessed on Plaintiffs' research portal was Plaintiffs' proprietary research on a number of sectors and companies, including the following:

Apple, Inc. (AAPL)

ASOS plc (ASC.GB)

Activision Blizzard, Inc. (ATVI)

Boohoo Group plc (BOO.GB)

Baozun Inc. (BZUN)

Charter Communications Inc. (CHTR)

Comcast Corporation (CMCSA)

Chipotle Mexican Grill, Inc. (CMG)

Carvana Co. (CVNA)

DoorDash, Inc. (DASH)

Domino's Pizza Group plc (DPZ)

Electronic Arts, Inc. (EA)

Grubhub, Inc. (GRUB)

HelloFresh SE (HFG)

Tencent Holdings, Ltd. (HKG:0700)

Just Eat Takeaway.com NV (JET.LN)

CarMax, Inc. (KMX)

Match Group, Inc. (MTCH)

Netflix, Inc. (NFLX)

Pinduoduo Inc. (PDD)

Penn National Gaming, Inc. (PENN)

Peloton Interactive, Inc. (PTON)

Papa John's International, Inc. (PZZA)

Restaurant Brands International Inc. (QSR)

Starbucks Corporation (SBUX)

Shake Shack, Inc. (SHAK)

Spotify Technology S.A. (SPOT)

Block, Inc. (SQ)

TAL Education Group (TAL)

Target Corporation (TGT)

Tesla, Inc. (TSLA)

Take-Two Interactive Software, Inc. (TTWO)

Ubisoft Entertainment SA (UBI)

Wayfair, Inc. (W)

Walmart Inc. (WMT)

Additionally, Luban accessed proprietary sector research regarding the "public cloud" sector, "handsets" (i.e., mobile devices), casinos, and U.S. restaurants and delivery. The vast majority of these sectors or companies were ones for which Yipit also had, or was in the process of developing,

a competitive research product.  Luban was obviously accessing this confidential data to assist Yipit in developing or updating its competitive products.

41.    By way of example, the access logs indicate that Luban accessed Plaintiffs' Tesla (TSLA) research repeatedly in March and April 2022.  Yipit launched research coverage on Tesla just six weeks thereafter.

42.    Luban's misappropriation of Plaintiffs' research products and the processes and methods for developing those products, was committed in furtherance of Yipit's business and within the scope of Luban's employment with Yipit.

43.    Upon information and belief, Yipit induced, directed, encouraged, and facilitated Luban's access of Plaintiffs' computer systems and databases without authorization and the misappropriation of confidential, trade secret information belonging to Plaintiffs.

44.    Upon information and belief, Yipit unjustly benefited from Luban's conduct by selling research products that were developed and/or enhanced through the use of Plaintiffs' confidential research, data, analyses, and conclusions and, consequently, wrongfully taking market share from Plaintiffs.

45.    On April 11, 2022, shortly after Plaintiffs learned that Yipit's Vice President of Product Development was accessing its confidential and proprietary information, M Science's General Counsel sent a letter to Vinicius Vacanti, Yipit's co-founder and CEO, and Nina Fletcher, Yipit's General Counsel.  The letter outlined the circumstances and activity indicating Luban's unauthorized use of credentials and email links to access Plaintiffs' portal and access proprietary research reports while employed by Yipit.  The letter further requested that Yipit "(1) instruct Mr. Luban to cease any further unauthorized accessing and/or use of [Plaintiffs'] proprietary

information and (2) carry out a comprehensive investigation of Mr. Luban and the apparent misuse of proprietary and M Science information."

46.     The only response M Science received to the letter and its further prodding was a phone call weeks later in which Yipit's General Counsel stated to M Science's General Counsel that Yipit questioned Luban and that Luban neither confirmed nor denied engaging in the conduct described in the letter.

47.     Upon information and belief, Yipit has not taken any action to prevent Luban or any other of its employees from using or disclosing Plaintiffs' research reports and data solutions or to otherwise identify or remedy Luban's unlawful conduct.

48.     Accordingly, upon information and belief, Defendants' misappropriation of Plaintiffs' confidential, proprietary, and trade secret information is ongoing.

## COUNT I
## VIOLATION OF DEFEND TRADE SECRETS ACT OF 2016, 18 U.S.C. § 1836, *et seq.*
### (Luban and Yipit)

49.     Plaintiffs incorporate by reference the preceding Paragraphs of the Complaint as if fully set forth herein.

50.     Plaintiffs are the owners of trade secret information and data, as defined under 18 U.S.C. § 1839(4), in the form of their research products and services and their underlying processes and methodologies for developing them.

51.     Plaintiffs' trade secret information and data derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons—including competitors—who can obtain economic value from it.  By way of example only, the investment research services provided by Plaintiffs to Customer 1 pursuant to the Agreement, including written research reports and associated data files, are the product of the unique application of Plaintiffs' technical knowledge and industry experience to special data

collections culled by Plaintiffs' analysts.  Plaintiffs expended substantial material, financial, and human resources to develop the information underlying these services, which cannot be easily acquired or replicated by others.  This confidential and proprietary information has particular value to customers who are willing to pay for it to assist them in making their own investment decisions.  Because Plaintiffs' reports and data have special value in the information marketplace, they have independent economic value that would be significantly, if not entirely, diminished if made generally available to the public or if misappropriated by a competitor.

52.    Additionally, Plaintiffs have taken reasonable steps to keep their research reports and databases secret, and the information contained in the reports and databases is not easily acquired or duplicated by others.  By way of example only, Plaintiffs make their services and work product, including the reports misappropriated by Defendants, available to customers entitled to receive those services and who agree to be and are bound by explicit restrictions which strictly limit the access to, use of, and disclosure of Plaintiffs' confidential information.

53.    Plaintiffs keep their research reports and databases maintained in secrecy through additional measures, including requiring Plaintiffs' employees to execute confidentiality agreements, restricting access to such information, and employing electronic and data security measures.

54.    Plaintiffs' trade secret information and data are related to Plaintiffs' products and services that are used in, or intended for use in, interstate commerce.  By way of example only, Plaintiffs contract with customers throughout the United States, Hong Kong, and other parts of the world to provide investment research services.

55.    Plaintiffs have invested substantial time, effort, and money in the acquisition, creation, and development of their services, reports, and databases.

56.     Luban, on behalf and at the direction of Yipit, and Yipit, with the assistance of Luban, used improper means, namely, unauthorized access and breach of a duty to maintain secrecy, to access, disclose, and use Plaintiffs' trade secret information and data for Defendants' benefit and to Plaintiffs' detriment.

57.     Luban had access to and became aware of Plaintiffs' trade secret information and data solely by virtue of his previous employment with a customer of Plaintiffs.

58.     By virtue of his former employment with Customer 1, and pursuant to the Agreement, Luban has an ongoing duty only to access or use Plaintiffs' confidential, proprietary, and trade secret information and data for the purpose of facilitating Customer 1's business and only in compliance with the terms of the Agreement.

59.     Yipit had access to and became aware of Plaintiffs' trade secret information and data solely by virtue of its employment of Luban and his misappropriation of Plaintiffs' information and data.

60.     At no time did Plaintiffs give Luban or Yipit permission to access, remove, use, or disclose Plaintiffs' confidential, proprietary, and trade secret information and data for their own benefit.

61.     Defendants' misappropriation of Plaintiffs' trade secret information and data has caused and/or will cause substantial harm to Plaintiffs by reducing the commercial value of Plaintiffs' services, placing Plaintiffs at a competitive disadvantage, and causing Plaintiffs to lose business.

62.     Further, Defendants unjustly benefited from their misappropriation by selling research products that were developed and/or enhanced through the use Plaintiffs' trade secrets.

63.     On information and belief, Defendants continue to use and benefit from Plaintiffs' trade secrets.

64.     Plaintiffs are entitled to compensatory and consequential damages caused by Defendants' actions and to damages for unjust enrichment caused by the misappropriation of Plaintiffs' trade secrets that is not addressed in computing damages for actual loss. *See* 18 U.S.C. § 1836(b)(3)(B).

65.     Defendants' actions have been intentional, knowing, willful, and malicious.

66.     Because Defendants' actions in violation of DTSA have been willful and malicious, Plaintiffs are also entitled to an award of exemplary damages and reasonable attorneys' fees. *See id.* § 1836(b)(3)(C)-(D).

### COUNT II
### MISAPPROPRIATION OF TRADE SECRETS UNDER NY LAW
### (Luban and Yipit)

67.     Plaintiffs incorporate by reference the preceding Paragraphs of the Complaint as if fully set forth herein.

68.     Defendants' actions, as set forth herein, constitute misappropriation of trade secrets under New York law.

69.     Defendants, by use of improper means, accessed and used research reports, associated data, and other information belonging to Plaintiffs, which information constitutes trade secrets under New York law.

70.     Such information was developed by Plaintiffs through great effort and expense, in terms of manpower, skill, discretion, judgment, time, and costs, and is extremely valuable to Plaintiffs, as it is used in and crucial to the operation of their business, cannot be easily acquired or duplicated by others, and, if made available to competitors, would enable them to unfairly compete with Plaintiffs to their detriment.

16

71.     Plaintiffs take reasonable efforts to maintain the secrecy of their trade secret information.

72.     Upon information and belief, Defendants knowingly and improperly obtained and used Plaintiffs' trade secret information to their advantage, for their own economic gain and to the detriment of Plaintiffs.

73.     Plaintiffs are entitled to compensatory and consequential damages caused by Defendants' actions and to damages for unjust enrichment caused by the misappropriation of their trade secrets.

74.     Defendants' actions have been intentional, knowing, willful and malicious.

75.     As a result, Plaintiffs are also entitled to an award of exemplary damages and reasonable attorneys' fees.

## COUNT III
## UNFAIR COMPETITION
### (Luban and Yipit)

76.     Plaintiffs incorporate by reference the preceding Paragraphs of the Complaint as if fully set forth herein.

77.     By engaging in the conduct described above, including the misappropriation and misuse of Plaintiffs' confidential and trade secret information, labors and expenditures, Defendants have engaged in unfair competition with Plaintiffs.

78.     Defendants' conduct has caused damage to Plaintiffs' business relationships with their customers and has damaged Plaintiffs' competitive position in the marketplace.

79.     Defendants' conduct, as described above, is contrary to honest industrial and commercial practices.

80.     Defendants' conduct was willful, intentional, and unprivileged and has caused Plaintiffs to suffer compensatory damages.

## COUNT IV
## UNJUST ENRICHMENT
### (Luban and Yipit)

81.    Plaintiffs incorporate by reference the preceding Paragraphs of the Complaint as if fully set forth herein.

82.    Plaintiffs provided Customer 1, subject to the terms of the Agreement, with access to confidential, proprietary, and trade secret investment research services, reports, and data generated and owned by Plaintiffs.

83.    As an employee of Customer 1, and solely by virtue of that status, Luban was provided with limited authorization, subject to the terms of the Agreement, to access and use Plaintiffs' confidential, proprietary, and trade secret investment research services, reports, and data.

84.    When Luban's employment with Customer 1 ended, whatever right or authority Luban had to access, or use Plaintiffs' confidential, proprietary, and trade secret investment research services, reports, and data also terminated.

85.    Defendants had full knowledge of the restrictions on the access to and use of Plaintiffs' confidential, proprietary, and trade secret investment research services, reports, and data.  Defendants also had knowledge that neither of them had authority to access or use Plaintiffs' confidential, proprietary, and trade secret investment research services, reports, and data.

86.    At all times relevant to this litigation, Defendants owed a legal duty to Plaintiffs to not unfairly or unduly take advantage of Plaintiffs or commit wrongful acts in order to unjustly enrich themselves at Plaintiffs' expense or at the expense of Plaintiffs' financial interests by accessing or using Plaintiffs' confidential, proprietary, and trade secret investment research services, reports, and data.

87.     However, Defendants jointly and severally have obtained a significant financial benefit of Plaintiffs' confidential, proprietary, and trade secret investment research services, reports, and data and Plaintiffs' investment in developing that information and data, and have unjustly enriched themselves by wrongfully converting, taking, or utilizing the information, data, property, efforts, and advice of Plaintiffs.

88.     Such acts and omissions leading to the Defendants' joint and several unjust enrichment were benefits that the Defendants obtained at the expense and detriment of Plaintiffs.

89.     It would be against good conscience to allow the Defendants, who obtained and used Plaintiffs' confidential, proprietary, and trade secret investment research services, reports, and data through improper means and wrongful conduct, to retain such benefits.

90.     Plaintiffs have suffered and will continue to suffer harm due to Defendants' joint and several unjust enrichment.

**COUNT V**
**CONVERSION**
**(Luban and Yipit)**

91.     Plaintiffs incorporate by reference the preceding Paragraphs of the Complaint as if fully set forth herein.

92.     Plaintiffs owned, had legal possession of, and were entitled to possession of their confidential, proprietary, and trade secret investment research services, reports, and data, as described above.

93.     The Defendants unlawfully assumed and exercised dominion and control over Plaintiffs' confidential, proprietary, and trade secret investment research services, reports, and data by accessing, downloading, taking, and retaining them, thereby excluding Plaintiffs from, and interfering with Plaintiffs' right to, exclusive possession and use of such services, reports, and data.

94.     Specifically, Defendants misappropriated numerous data-driven, industry- or company-specific research reports belonging to Plaintiffs and also misappropriated back up files for many of those reports.

95.     Upon information and belief, Defendants used those reports and back up files, and the proprietary, confidential information contained therein, to short-cut their own efforts to develop that market, industry, and company information and to financially benefit from doing so by providing the information to its own customers.

96.     The unauthorized disclosure and use of Plaintiffs' confidential, proprietary, and trade secret investment research services, reports, and data destroyed its value.

97.     Through the conduct alleged herein, Defendants have converted Plaintiffs' property to their own use and benefit without the authority to do so.

98.     Defendants' conversion of Plaintiffs' property has been knowing, intentional, wanton, willful, and an outrageous violation of Plaintiffs' rights and ability to exercise and benefit from those rights.

99.     This theft of Plaintiffs' confidential, proprietary, and trade secret investment research services, reports, and data resulted in financial harm to Plaintiffs, with no corresponding benefit.

100.    As a proximate result of Defendants' conversion of Plaintiffs' property, Plaintiffs have suffered substantial damages.

**<u>COUNT VI</u>**
**CONSPIRACY**
**(Luban and Yipit)**

101.    Plaintiffs incorporate by reference the preceding Paragraphs of the Complaint as if fully set forth herein.

102.    Defendants conspired with each other for an unlawful purpose, to obtain Plaintiffs' confidential, proprietary, and trade secret investment research services, reports, and data in connection with developing or enhancing products to compete with Plaintiffs using Plaintiffs' work product, property, and confidential information.

103.    Defendants have entered into a civil conspiracy to engage in, inter alia, misappropriation of trade secrets, unjust enrichment, and conversion.

104.    Defendants each agreed to this common goal.

105.    Defendants acted in concert with the specific object of harming Plaintiffs for their own personal gain.

106.    Each Defendant performed an overt act in furtherance of the conspiracy.

107.    The unlawful activities alleged herein were committed in furtherance of that conspiracy.

108.    As a consequence of Defendants' combined, concerted, and continued efforts to steal data, information, trade secrets and, ultimately, Plaintiffs' customers, Plaintiffs have been injured and are entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request:

a)      A judgment in their favor and against Defendants on all claims herein;

b)      An injunction requiring Defendants, and all those acting in concert with them, (i) to cease using Plaintiffs' research products and services, the underlying processes and methodologies for developing those products and services, and any

other of Plaintiffs' trade secrets or confidential information in their possession or under their control; and (ii) to return all such information to Plaintiffs.

c)    Compensatory and consequential damages to be determined at trial;

d)    Exemplary/punitive damages to be determined at trial;

e)    Attorneys' fees, costs, and expenses;

f)    Pre- and post-judgment interest; and

g)    Such other relief as the Court deems just and proper.

Dated:  January 21, 2025                Respectfully submitted,

*/s/Stephen W. Kelkenberg*
**BUCHANAN INGERSOLL & ROONEY PC**
Stephen W. Kelkenberg
(NY Reg. No. 4096269)
501 Grant Street, Suite 200
Pittsburgh, Pennsylvania  15219-4413
Telephone: (716) 725-4349
Facsimile: (412) 562-1041
stephen.kelkenberg@bipc.com

Andrew J. Shapren (*pro hac vice forthcoming*)
50 South 16th Street, Suite 3200
Philadelphia, Pennsylvania  19102
Telephone: (215) 665-3853
andrew.shapren@bipc.com

*Attorneys for Plaintiffs*